## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TEDDIE WILLIAMS, Individually and as
Parent and Next Friend of Rainan Samayoa;
RAINAN SAMAYOA, a Mentally Challenged
Person and MARIA CONTRARAS,
Conservator & Guardian of Rainan Samayoa,

      Plaintiffs,

vs.                                   No. CIV 13-0479 JB/WPL

BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO, a Body
Corporate of the State of New Mexico, for Itself
and Its Public Operations Including
UNIVERSITY OF NEW MEXICO HEALTH
SCIENCES CENTER and Its Components, the
UNIVERSITY OF NEW MEXICO SCHOOL
OF MEDICINE, UNIVERSITY OF NEW
MEXICO HOSPITAL BEHAVIORAL
HEALTH PROGRAMS, UNIVERSITY OF
NEW MEXICO PSYCHIATRIC CENTER and
CORRECTIONAL HEALTHCARE
COMPANIES, INC., a Foreign Corporation,

      Defendants.

## AMENDED MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** comes before the Court on Correctional Healthcare Companies Inc.'s

Partial Motion to Dismiss Plaintiff's Second Amended Complaint for Damages and Medical

Negligence, filed January 30, 2014 (Doc. 63)("MTD").[2]  The Court held a hearing on July 7,

---

[1]The Court issued its initial Memorandum Opinion and Order, filed August 11, 2014 (Doc. 140), and now submits this Amended Memorandum Opinion and Order with the following modifications: footnote 1, at 1; footnote 2, at 1; footnote 7, at 17, and accompanying text; footnote 8, at 20; and footnote 13, at 38, and the above-the-line citation accompanying it.

[2]The MTD's sole movant is Defendant Correctional Healthcare Companies, Inc.; the Court does not consider Defendant University of New Mexico ("UNM") or any of its affiliates to have joined in the MTD, although UNM made some statements in the hearing to the effect that it

2014.  The primary issues are: (i) whether to dismiss Counts IV and V in the Plaintiffs' Second Amended Complaint for Damages and Medical Negligence, filed November 26, 2013 (Doc. 30)("SAC") -- the Plaintiffs' claims for intentional infliction of emotional distress and negligent infliction of emotional distress, respectively -- alleged against Defendant Correctional Healthcare Companies, Inc. ("Correctional Healthcare"); and (ii) whether to dismiss Count VI -- Plaintiff Teddie Williams' claim for loss of consortium stemming from injuries Correctional Healthcare allegedly caused to her son, Plaintiff Rainan Samayoa -- alleged against Correctional Healthcare.  The Court has already dismissed Counts IV and V asserted against Correctional Healthcare -- the Plaintiffs assert that they never intended to allege those counts against Correctional Healthcare in the first place -- and the Court will thus deny that portion of the MTD as moot.  The Court will also dismiss without prejudice Count VI as asserted against Correctional Healthcare, because Williams' relationship with Samayoa lacks the mutual dependence required under New Mexico law for her to seek damages for loss of consortium. The Court, therefore, grants the MTD in part and denies it in part.

## FACTUAL BACKGROUND

The Court takes its facts from the SAC.  In 2010, Samayoa was twenty-five years old and "already had a very significant psychiatric history including a traumatic brain injury."  SAC ¶ 13, at 3.  On July 3, 2010, Williams, Samayoa's mother, took Samayoa to the University of New Mexico ("UNM") Psychiatric Center emergency services in Albuquerque, New Mexico, because he had symptoms of disorganized behavior; he was admitted to the University of New Mexico Hospital Behavioral Health Programs and discharged on August 2, 2010.  SAC ¶¶ 14, at 3.

"probably should have" joined the MTD, and might wish to join "after the fact."  Supra note 7, at 17, and accompanying text.

During his stay at the UNM Hospital Behavioral Health Programs and subsequent visits through February 8, 2011, Samayoa was diagnosed with chronic schizophrenia, paranoid ideation, intermittent explosive disorder, auditory hallucinations, post-traumatic stress disorder, borderline intellectual disorder, and traumatic brain injury.  See SAC ¶ 15, at 3-4.  When he was released from the UNM Hospital Behavioral Health Programs, his "mental condition had stabilized to the point he could hold meaningful conversations with his mother, Plaintiff Williams.  He could function mentally within limitations and was not a harm to himself or others."  SAC ¶ 16, at 4.

On January 19, 2011, Samayoa exhibited "psychiatric behavioral problems including disorientation, confusion, depression and aggression" while he was at Valencia Counseling in Los Lunas, New Mexico; he was transported to the UNM Psychiatric Center emergency services. SAC ¶ 17, at 4.  The UNM Hospital Behavioral Health Programs staff evaluated Samayoa, and determined that he should be admitted for safety and stabilization; Samayoa was admitted involuntarily.  See SAC ¶ 18, at 4.  "A few minutes later, Plaintiff Samayoa allegedly assaulted two staff members.  Instead of treating his conduct which was consistent with his mental disorder, staff involved the UNM Police Department and ultimately had Plaintiff Samayoa discharged to the custody of the Albuquerque Police Department . . . ."  SAC ¶ 19, at 4.  While he was incarcerated, Samayoa was not given his psychotropic medications, "even though [Correctional Healthcare and Defendant Bernalillo County Metropolitan Detention Center ('BCMDC')] staff were aware he was very ill and had been on suicide watch at [the UNM Hospital Behavioral Health Programs]."[3]  SAC ¶¶ 21, at 4-5.  Samayoa was incarcerated until

---

[3]The SAC states that Samayoa had been on suicide watch at "UNMH."  While the SAC does not define that acronym, it most likely refers to the UNM Hospital, which is commonly called UNMH in the area.  In any case, the Court believes that the Plaintiffs intended to state more specifically that Samayoa had been on suicide watch at the UNM Hospital Behavioral

January 26, 2011, and then transported back to the UNM Hospital Behavioral Health Programs.  See SAC ¶ 20, at 4.

On February 5, 2011, Samayoa called 911, stating that he wanted to kill himself; the Belen, New Mexico, Police Department took Samayoa to the UNM Psychiatric Center[4] emergency services.  See SAC ¶ 23, at 5.  The UNM Hospital Behavioral Health Programs evaluated Samayoa after he spent about fifty-two hours in the emergency services and determined that "his actions were inappropriate, that he had become progressively worse since incarceration and planned to transfer him from [the UNM Psychiatric Center] emergency services to [the UNM Hospital Behavioral Health Programs] as soon as a bed was available for him (in-patient care)."  SAC ¶ 24, at 5.  On February 8, 2011, the UNM Hospital Behavioral Health Programs had a unit available, "but instead, transported [Samayoa] to Mesilla Valley Hospital in Las Cruces, New Mexico, without Plaintiff Williams' consent and against her wishes."  SAC ¶ 25, at 5.  The Mesilla Valley Hospital assessed that Samayoa was a danger to himself and others, and diagnosed him with a psychotic disorder and a traumatic brain injury.  See SAC ¶ 26, at 5.  Samayoa stayed at Mesilla Valley Hospital until February 24, 2011, and was then transferred to New Mexico Behavioral Health in Las Vegas, New Mexico, where he was diagnosed with intermittent explosive disorder, psychotic disorder, and a traumatic brain injury, and where he stayed until he was discharged on April 21, 2011.  See SAC ¶¶ 26-27, at 5-

Health Programs, which the Plaintiffs abbreviate as "UNMHBHP"; the Plaintiffs may have also intended the University of New Mexico Health Sciences Center, which they abbreviate as "UNMHSC."  SAC ¶¶ 5, 7, at 2; id. ¶ 21, at 5.

[4]In paragraph 23 of the SAC, the Plaintiffs state that the Belen Police Department took the Defendant to "UNMPS emergency services."  SAC ¶ 23, at 5.  The Court believes the Plaintiffs intended to write "UNMPC," which is their abbreviation for the UNM Psychiatric Center.  SAC ¶ 8, at 2.

6.  After these events, Samayoa "has not regained enough mental stability to hold any degree of meaningful conversations with his mother, Plaintiff Williams, or anyone else.  He has remained in a volatile mental state and is periodically dangerous to himself and to others."  SAC ¶ 28, at 6.

## PROCEDURAL BACKGROUND

The Plaintiffs allege six claims in the SAC: (i) a claim of medical negligence, in which Correctional Healthcare is clearly not named, see SAC ¶¶ 33-37, at 6-7 (not mentioning "CHC" -- which is the acronym that Plaintiffs use for this Defendant -- or its full name in the five-paragraph allegation); (ii) a claim of negligence per se for failure to comply with the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, in which Correctional Healthcare is clearly not named, see SAC ¶¶ 38-43, at 7-8 (not mentioning Correctional Healthcare ); (iii) a claim of negligence, which appears to be asserted against Correctional Healthcare, see SAC ¶¶ 44-48, at 8 (alleging that Correctional Healthcare "w[as] negligent in [its] care and treatment of Plaintiff Samayoa by placing him in the general population and denying him access to [its] specialized services and not providing him the medication [it] was aware [that Samayoa] needed for his illness," and that said negligence "w[as] the cause of injuries and damages to Plaintiff Samayoa and Williams"); (iv) a claim of intentional infliction of emotional distress, which appears to be asserted against Correctional Healthcare, see SAC ¶¶ 49-53, at 8-9 (alleging that Correctional Healthcare's "conduct . . . was extreme and outrageous," that it "acted intentionally and recklessly in [its] care and treatment," and that "[a]s a result of [its] conduct . . . Plaintiffs experienced severe emotional distress causing injuries and damages"); (v) a claim of negligent infliction of emotional distress, which appears to be asserted against Correctional Healthcare, see SAC ¶¶ 54-58, at 9-11 (making allegations against Correctional Healthcare which are identical to those made against Correctional Healthcare in the claim of intentional infliction of emotional

distress); and (vi) a claim for loss of consortium, in which Correctional Healthcare appears to be named, see SAC ¶¶ 59-64, at 11 (alleging that Correctional Healthcare "caused repeated injuries to Plaintiff Samayoa's mental state and stability through [its] actions or failures to act to the point he lost the ability to communicate rationally with his own mother").  In the prior motion to dismiss in this case, then-Defendant Board of County Commissioners of the County of Bernalillo[5] ("Bernalillo County") moved to dismiss, on grounds of sovereign immunity, the four claims that it believed that the Plaintiffs had asserted against it.  See Defendant Board of County Commissioners of the County of Bernalillo's Motion to Dismiss Plaintiffs' Claims Against Bernalillo County Metropolitan Detention Center, filed January 3, 2014 (Doc. 48).  The Plaintiffs then clarified that they were only asserting three claims against Bernalillo County and that, although Bernalillo County was mentioned and accused of certain conduct in a fourth claim, the Plaintiffs did not intend to allege that claim against Bernalillo County.  See Plaintiffs' Response to Defendant the Board of County Commissioners of the County of Bernalillo's Motion to Dismiss Plaintiffs' Claims Against Bernalillo County Metropolitan Detention Center at 9, filed January 21, 2014 (Doc. 59).  Bernalillo County went on to prevail on all of its arguments, and the Court dismissed it from the case.  See Memorandum Opinion and Order at 1-2, 32, filed April 29, 2014 (Doc. 109).

---

[5]The Plaintiffs erroneously named the Bernalillo County Metropolitan Detention Center ("BCDC"), not the Board of County Commissioners, as Defendant.  SAC ¶ 9, at 2-3.  Because the "BCDC is similar to a police department in that it is . . . subsumed within the larger municipality," it "lack[s a] legal identit[y] apart from the municipality," and the "Plaintiff[s], thus, cannot sue BCDC."  Ketchum v. Albuquerque Police Dep't, 958 F.2d 381, at *2 (10th Cir. 1992)(unpublished)(citing Martinez v. Winner, 771 F.2d 425, 443 (10th Cir. 1985)).  The Court, thus, restyled the Plaintiffs' allegations as being against the Board of County Commissioners, rather than the BCDC, and referred to the Plaintiffs' claims as such throughout its prior opinion.  See Memorandum Opinion and Order at 1 n.1, filed April 29, 2014 (Doc. 109).

Here, again, there are questions about what claims the Plaintiffs have alleged against what parties.  In its MTD, after first briefly reciting the factual and procedural background, see MTD at 2-3, and the rule 12(b)(6) standard, see MTD at 3-5, Correctional Healthcare spends much of its brief arguing for the dismissal of Counts IV and V, see MTD at 6-8.  The Court will not summarize these arguments here, because the first thing the Plaintiffs do in responding to the MTD is clarify that they never intended to assert Counts IV or V against Correctional Healthcare.  See Plaintiffs' Response in Opposition to Defendant Correctional Healthcare Companies Inc.'s Partial Motion to Dismiss Plaintiff's Second Amended Complaint for Damages and Medical Negligence Filed January 30, 2014, Document No. 63 at 9, filed February 17, 2014 (Doc. 79)("Response").

Correctional Healthcare then argues for the dismissal of Count VI, loss of consortium, which is the sole subject of this Memorandum Opinion and Order.[6]  See MTD at 8-12.  It contends both that the "Plaintiffs have not alleged that . . . Williams had a sufficiently close relationship to Samayoa to support a claim for loss of consortium, or that such a relationship was foreseeable," which Correctional Healthcare asserts are the two components of a loss-of-consortium claim.  MTD at 8 (citing Wachocki v. Bernalillo Cnty. Sherriff's Dep't, 2010-NMCA-021, ¶ 50 ("Wachocki")).  Correctional Healthcare argues that the rule articulated in Palsgraf v. Long Island R.R., 162 N.E. 99 (N.Y. 1928)("Palsgraf") -- that, "[i]n order for the defendant to have a duty, the plaintiff must have been foreseeable" -- bars recovery on Count VI.

---

[6]The Plaintiffs continue to allege Count III, a claim of negligence, against Correctional Healthcare, but Correctional Healthcare does not move for dismissal of that claim.  See SAC ¶¶ 44-48, at 8; MTD at 4 ("[O]nly Counts III-VI are asserted against CHC. . . .  Plaintiffs fail to state a claim for negligent infliction of emotional distress, intentional infliction of emotional distress, or loss of consortium.  Accordingly, the Counts . . . must be dismissed.").

MTD at 8.  Correctional Healthcare contends that New Mexico has adopted the <u>Palsgraf</u> rule, <u>see</u> MTD at 8 (citing <u>Calkins v. Cox Estates</u>, 110 N.M. 59, 61-62 (1990)), and that Williams was not a foreseeable plaintiff because she, unlike Samayoa, was not in the "zone of danger," MTD at 8 (quoting <u>Calkins v. Cox Estates</u>, 110 N.M. at 61-62)(internal quotation marks omitted). Correctional Healthcare also cites <u>Solon v. WEK Drilling Co., Inc.</u>, 113 N.M. 566, 569 (1992), for this proposition.  <u>See</u> MTD at 9.

Correctional Healthcare further argues that the relationship between Williams and Samayoa lacks the requisite features to merit a loss-of-consortium claim.  <u>See</u> MTD at 10-11. Correctional Healthcare lays out the facts of <u>Wachocki</u>, contending that, in that case, two brothers who "had been roommates for the past eight months, split bills and household chores, and socialized together," were deemed to be insufficiently mutually dependent to merit one brother bringing a loss-of-consortium claim for the other brother's death.  MTD at 10 (citing <u>Wachocki</u>, 2010-NMCA-021, ¶ 14).   Correctional Healthcare summarizes its argument as follows:

> Quite simply, there is a very heavy burden on a plaintiff who wishes to assert a loss-of-consortium claim: a plaintiff must assert a closer relationship than existed between the Wachocki brothers in order to state a claim for loss of consortium. Based on this standard, Plaintiff has clearly not alleged facts that would justify a claim for loss of consortium.   Indeed, Plaintiff has not alleged any facts that would indicate that their relationship was any closer than a typical relationship between a parent and an adult child.  The only fact that she alleged in support of her claim for loss of consortium was that Samayoa was able to hold "meaningful conversations" with his mother.  SAC ¶ 16.  This type of relationship is clearly not as close as the relationship between the Wachoki brothers, an especially close relationship that was, nonetheless, insufficient to support a claim for loss of consortium.  Further, even this ability had deteriorated by the time Samayoa was incarcerated, as it was clear that he had suffered a relapse of his mental condition. SAC ¶ 17.  Thus, it is clear that she did not have the type of relationship necessary to allow for a loss-of-consortium claim.

MTD at 11.

In their Response, the Plaintiffs first submit a lengthy factual and procedural background, see Response at 1-8, and then "disagree with . . . CHC's statement of the applicable standard," arguing for a construction of rule 12(b)(6) that essentially resembles the standard before Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), see Response at 8-9.   The Plaintiffs next clarify that "they are **NOT** bringing claims for (1) Intentional Infliction of Emotional Distress, [or] (2) Negligent Infliction of Emotional Distress" against Correctional Healthcare and that "the relief requested by CHC for these claims, and these claims only, should be granted."   Response at 9 (emphasis in original).   The Plaintiffs then proceed to defend their assertion of Count VI against Correctional Healthcare.   See Response at 9-14.

The Plaintiffs assert that Williams is Samayoa's biological mother, that they lived together, that Samayoa had "chronic mental illness," and that his "ability to function independently was extremely limited and less than the level of a typical American child." Response at 10.   They argue that Williams is Samayoa's conservator, because she "takes charge of overseeing [his] daily activities, such as health care [and] living arrangements."   Response at 10-11.   The Plaintiffs argue that, in Lozoya v. Sanchez, 2003-NMSC-009, the Supreme Court of New Mexico set forth the factors that determine whether the first element of a loss-of-consortium claim -- that the claimant and the injured individual shared a sufficiently close relationship -- is satisfied.   See Response at 11.   They contend that "mutual dependence is the key" factor. Response at 12 (citing Wachocki, 2010-NMCA-021, ¶ 10).   The Plaintiffs argue that this element is satisfied because "it would be impossible to show a closer familial relationship than the one between Plaintiffs due to the level of care and championship [sic] between the Plaintiffs." Response at 12.

Addressing the foreseeability element, the Plaintiffs state that "[i]t is glaring that Defendant CHC relies on [a] relatively dated loss of consortium case for [its] foreseeability argument."  Response at 13 (referring to Solon v. WEK Drilling Co., Inc., 1992-NMSC-023). They contend that, "in Lazoya, the Supreme Court rejected the requirement for a claimant to have 'special legal status,' such as a legal marriage, with [the] victim to bring a loss of consortium" claim.  Response at 13 (citing 2003-NMSC-009, ¶ 18).  They seem to argue that the fact that Williams and Samayoa are biologically related satisfies the foreseeability argument. See Response at 14.

Correctional Healthcare replied to the Response, addressing Count VI in greater detail. See Correctional Healthcare Companies Inc.'s Reply in Support of Its Partial Motion to Dismiss Plaintiffs' Second Amended Complaint for Damages and Medical Negligence, filed March 17, 2014 (Doc. 94)("Reply").   Again, Correctional Healthcare addresses foreseeability first.   See Reply at 3-5.  It argues that, "[i]n New Mexico, it is settled law that it is not foreseeable that an adult would have parents with a sufficiently close relationship" to trigger a claim for loss of consortium.  Reply at 3 (citing Solon v. WEK Drilling Co., Inc., 113 N.M. at 569; Cheromiah v. United States, 55 F. Supp. 2d 1295, 1309 (D.N.M. 1999)(Vazquez, J.)).  Correctional Healthcare argues that the "Plaintiffs do not dispute the fact that the Solon holding states that the relationship between a mother and her adult child was not foreseeable enough to support a loss-of-consortium claim."  Reply at 3.  It responded to the Plaintiffs' attempt to discredit Solon v. WEK Drilling Co., Inc. by referring to its age: "[D]espite the fact that Solon is over twenty years old, it is still good law in New Mexico, because it has never been overturned."  Reply at 3.

Correctional Healthcare attempts to distinguish Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, in which the Supreme Court of New Mexico held that a

grandparent could maintain a loss-of-consortium claim for the death of a minor grandchild. However, as Plaintiffs admit, the Fernandez opinion allowed such a claim only where the decedent was a minor. Response at 12 (citing 1998-NMSC-039, ¶ 31). By Plaintiffs' own admission, Samayoa was not a minor at the time of the incident. Accordingly, in this case, the loss-of-consortium claim is foreclosed by the fact of Samayoa's age.

Reply at 4. It also attempts to distinguish Lozoya v. Sanchez, contending that that case held that

a person brings a claim to recover for the loss of a relational, rather than legal interest. See 2003-NMSC-009, ¶ 20. However, this holding does not overturn the Solon decision. The Solon decision limiting loss of parental consortium claims to cases where the child was a minor was not based on the legal interest that the parents of a minor child have. Rather, it was based on lack of forseeablity. See 113 N.M. at 571. Quite simply, in order for a loss-of-consortium claim to lie, there must be a very close relationship between the injured party and another person, and this relationship must be foreseeable. It is foreseeable that an adult will have a sufficiently close relationship with either a spouse or the functional equivalent, as was the situation in Lozoya. 2003-NMSC-009, ¶ 20. However, under the Solon holding, it is not foreseeable that an adult would have such a relationship with his parents. See 113 N.M. at 571. Nothing in Lozoya or Fernandez has overturned this holding. In fact, the Lozoya opinion actually undermines Plaintiffs' argument. Plaintiffs largely based their argument in support of their loss-of-consortium claim on the fact that Plaintiff Williams had been appointed by the Court as Samayoa's conservator. See Response at 10. This is a legal status, rather than one simply based on the personal relationship between the two individuals. However, the portion of the Lozoya holding cited by Plaintiffs specifically states that a claim for loss of consortium cannot be based on a legal interest. See 2003-NMSC-009, ¶ 20.

Reply at 4. Correctional Healthcare closes its foreseeability argument by asserting that, "[q]uite simply, Solon remains binding precedent set by the highest court of the state of New Mexico regarding a matter of state law." Reply at 5.

Correctional Healthcare next addresses the relationship element of the claim. See Reply at 5-8. It contends that, although "the leading cases in New Mexico concerning loss of consortium . . . generally involve the death of one party, and are thus not very instructive regarding non-fatal injuries," "the general rule is that, while loss of spousal consortium is sometimes allowed in cases of non-fatal injuries, the same does not apply to parental

consortium."  Reply at 5.  It cites an Illinois Supreme Court case, <u>Dralle v. Ruder</u>, 529 N.E.2d 209 (Ill. 1988), and asserts that the Supreme Court of New Mexico "has never recognized a claim for loss of consortium, even in the case of wrongful death, to the parents of adult children." Reply at 6.

Correctional Healthcare argues that spousal relationship loss-of-consortium claims are cognizable even when one spouse suffers only non-fatal injuries, because the nature of the relationship fundamentally changes from one of husband and wife to one of nurse and patient. <u>See</u> Reply at 6 (citing <u>Keener v. Mid-Continental Cas. Co.</u>, 817 So. 2d 347, 365 (La. Ct. App. 5th Cir. 2002); <u>Oxley v. Sabine River Auth.</u>, 663 So. 2d 497 (La. Ct. App. 3d Cir. 1995)).  It argues that "the basis for the supposed close relationship between Samayoa and his mother, despite the fact that Samayoa is not a minor, was not the fact that he could hold 'meaningful conversations' with her, but the fact [is] that he needed his mother's constant care."  Reply at 7-8.

> If it were the basis, then a parent could assert a loss-of-consortium claim for the loss of an adult child, but not for the loss of a child who is too young to speak.  As noted above, and in the Motion, the opposite is true: a parent can assert a loss-of-consortium claim for a child who is too young to speak, but not for an adult child. Even assuming, as we must for the purposes of this Motion, that Samayoa could carry on meaningful conversations with his mother prior to the incident, and no longer can carry on these conversations, this does not constitute a fundamental change in the nature of the relationship between Samayoa and his mother, of the sort that would allow for a claim for loss of consortium.  Samayoa is still living, and still needs his mother's constant care.  The relationship between Samayoa and his mother was that of a patient and a nurse, both before and after the incident in question.  Accordingly, Plaintiffs' claim for loss of consortium must be dismissed.

Reply at 8.

Less than a month after the completion of briefing on the MTD, <u>see</u> Notice of Completion of Briefing on Correctional Healthcare Companies Inc.'s Partial Motion to Dismiss

Plaintiffs' Second Amended Complaint for Damages and Medical Negligence, filed March 18, 2014 (Doc. 95), the parties jointly filed an order -- which the Court signed -- dismissing Counts IV and V as asserted against Correctional Healthcare and Defendant Board of Regents of the University of New Mexico, see Stipulated Order Dismissing Counts IV and V Against Defendant Board of Regents of the University of New Mexico and Correctional Healthcare Companies, Inc., filed April 3, 2014 (Doc. 97).

The Court held a hearing on July 7, 2014.  See Transcript of Hearing, taken July 7, 2014, filed July 23, 2014 (Doc. 136)("Tr.").  The Court first confirmed with the Plaintiffs that they were conceding dismissal of Counts IV and V as asserted against Correctional Healthcare.  See Tr. at 3:7-13 (Court, Barela).  The parties then discussed the loss-of-consortium claim.  See Tr. at 3:14-44:24 (Court, Park, Barela).  Correctional Healthcare first argued the foreseeability element, asserting that Williams was not a foreseeable plaintiff under the Palsgraf standard, which New Mexico adopted generally in Calkins v. Cox Estates, and applies in the context of loss-of-consortium claims in Solon v. WEK Drilling Co., Inc..  See Tr. at 4:2-18 (Park).  It contended that "[t]he fact of the matter is that, quite simply, the State of New Mexico does not recognize a loss of consortium claim by a parent for the death of an adult child, because it is not foreseeable."  Tr. at 5:11-14 (Park).

Correctional Healthcare then quickly attempted to distinguish several of the cases that the Plaintiffs cited.  See Tr. at 5:21-24 (Park).  It said that Fernandez v. Walgreen Hastings Co. is different, because in involved the death -- not the non-death injury -- of a minor grandchild, not an adult.  See Tr. at 5:24-6:4 (Park).  It argues that Lozoya v. Sanchez cuts against the Plaintiffs' arguments, because that case holds that a loss-of-consortium claim vindicates "a relational

interest, . . . rather than a legal relationship," and that the Plaintiffs' conservatorship argument focuses on a legal relationship.  Tr. at 6:8-9 (Park).

Correctional Healthcare then moved to the other element, arguing that Williams and Samayoa "did not have a sufficiently close relationship."  Tr. at 7:5-6 (Park).  It cited Wachocki, contending that, despite being a death case, the court there found that the plaintiff had not alleged facts to establish a sufficiently close relationship between the two brothers.  See Tr. at 7:12-22 (Park).  It argued that at no point in the SAC do the Plaintiffs "alleg[e] that there was anything different or special in this relationship different from [the] Wachockis'."  Tr. at 8:1-3 (Park).

The Court then inquired about cases that distinguish death versus non-death claims and adult child versus minor child claims.  See Tr. at 10:14-20 (Court).  Correctional Healthcare stated that, because this case is both non-death and involves an adult child, a loss-of-consortium claim is not viable.  See Tr. at 11:22-23 (Park).  When pressed by the Court, however, Correctional Healthcare conceded that a loss-of-consortium claim could possibly have been brought in this case had Samayoa been killed, but that it was unavailable as a non-death claim. See Tr. at 11:13-21 (Court, Park).  It argued that "the standards are really two-fold, which is in death cases, I believe the courts work a little more closely and harder to find a loss of consortium claim.  But in nondeath cases, it's a higher challenge, because again, loss of consortium was originally . . . just for marital couples."  Tr. at 12:10-16 (Park).

The Court asked how Correctional Healthcare would respond to the argument that Samayoa was child-like in his mental state and thus should be treated like a child for the purpose of the loss-of-consortium analysis.  See Tr. at 13:19-14:4 (Court).  Correctional Healthcare responded that, even if Samayoa and Williams' actual relationship should be analyzed as that of a parent to a minor child, it would not change the apparent nature of the relationship and thus

would still be unforeseeable.   See Tr. at 14:5-15:4 (Park)("[Correctional Healthcare's employees] thought they were simply dealing with an adult male.").   Correctional Healthcare asserted that "[n]o New Mexico appellate court has found a parent/adult child or a[ non-spousal] adult and adult loss of consortium claim in a nonfatal case[,] . . . [a]nd in fact, they've only found loss of consortium claims in fatal cases in the case where the couple is married, or Lozoya, where they had the functional equivalent of such."  Tr. at 16:10-16 (Park).

The Plaintiffs then presented their arguments, first addressing foreseeability:

I have to point out that this whole thing about foreseeability and nonfatal injury is a complete question that is answered on point, completely on point by a case in New Mexico.  And it's nonfatal, and it deals with the issue of foreseeability under the Tort Claims Act.

. . . .

Brenneman [v. Bd. of Regents of the Univ. of N.M., 2004-NMCA-003, 84 P.3d 685] is a case that is on point for the case that I'm bringing.  It is a case that presents whether loss of consortium damages are recoverable under Section 41-4-9 and 10 of the New Mexico Tort Claims Act.

This is the operation of a hospital exemption, okay. So we're also talking in terms of the University of New Mexico.  Because I think that fairness would allow Mr. Garcia to join in here. But in this particular case, the holding of the court is this, and it says, "Damages for loss of consortium are recoverable.  The plain language of the Tort Claims Act, cases interpreting it, and its legislative history, all indicate that loss of consortium damages should be recoverable under the Section of 41-4-10.  "Persons claiming loss of consortium are foreseeable plaintiffs under traditional tort concepts, and loss of consortium as a type of damage resulting from bodily injury fits with the characterization as a derivative claim."

Tr. at 18:22-19:2 (Barela); id. at 19:12-20:7 (Barela).  The Court expressed skepticism that the standard for triggering a waiver of immunity under the New Mexico Tort Claims Act is identical to the substantive standard for satisfying the elements of a loss-of-consortium claim.  See Tr. at 20:10-19 (Court).

The Plaintiffs conceded that they "must demonstrate two elements in order to recover [loss-of-consortium] damages," those being closeness of relationship and foreseeability.  Tr. at 21:2-3 (Barela)(citing Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125).  They argued, however, that New Mexico courts use a holistic, case-by-case, fact-intensive approach to determining whether a given relationship qualifies for a loss-of-consortium claim, and that the nominal relationship between the claimant and the injured party -- parent-child, sibling, spousal, or any other -- does not impact the outcome.  See Tr. at 22:17-24:13 (Barela).

The Plaintiffs expounded upon their reference to Solon v. WEK Drilling Co., Inc. as dated, see Response at 13, asserting that, in "1992, you had a completely different court[ which] hadn't even found -- [which was the] last in the Union to find [a] loss of consortium claim. Now, we're first on same sex partners and grandparents," Tr. at 28:16-19 (Barela).  Correctional Heatlhcare responded as follows:

> I appreciate Mr. Barela's commentary that the case is relatively old. But the case . . . has not been overturned.  This case is the law of the State of New Mexico.  If we were going to ignore every case that was over 25 years old, we'd be ignoring cases like Brown v[.] Board of Education.  That simply is not at valid legal argument, Your Honor.

Tr. at 32:1-8 (Park).

The Court stated that it would have to look into the issue further, but that it was inclined to grant the MTD as to Count VI.  See Tr. at 42:8-43:9 (Court).  The UNM Defendants also discussed joining the MTD and seeking dismissal of Counts IV, V, and VI against them as well, but only if the Court granted the MTD.  See Tr. at 18:10-13 (Garcia)("Your Honor, I did not join

this motion.  I probably should have.  Depending on how you rule, I may ask you to include me in the order after the fact.  That's all I have.").[7]

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is

---

[7]It is not clear to the Court whether the UNM Defendants wish to join in the MTD as to Count VI only, or whether they also seek to adopt Correctional Healthcare's original arguments as to Counts IV and V.  The SAC is ambiguous as to what claims are asserted against whom, but Counts IV and V appear to be asserted against UNM.  See SAC ¶¶ 49-53, at 8-9; id. ¶¶ 54-58, at 9-11.  For this reason, and because the UNM Defendants couched their request to join the MTD in conditional, ex post terms, the Court will not consider the UNM Defendants to have yet joined in the MTD.

insufficient.  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The United States Court of Appeals for the Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the

complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), although the Tenth Circuit has not squarely addressed this practice.

## NEW MEXICO LAW REGARDING LOSS-OF-CONSORTIUM CLAIMS

Loss-of-consortium claims allow a claimant -- traditionally a husband -- who was not directly harmed by a tort to nonetheless collect damages[8] for a tort that injured another individual -- traditionally his wife -- with whom the non-injured claimant has a close relationship.  See 131 Am. Jur. 3d Proof of Facts § 187 (2013).  The traditional basis for this recovery was that the tortfeasor's actions not only injured the wife, entitling her to damages, but also deprived the husband of "the variety of intangible relations which exist between spouses living together in marriage.  These intangible elements are generally described in terms of 'affection, society, companionship and sexual relations.'"  Hopson v. St. Mary's Hospital, 408 A.2d 260, 261 (Conn.

---

[8]Loss of consortium can be asserted against New Mexico government actors, despite that it is not specifically mentioned in the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-1 to -30, provided that the underlying tort -- the one that caused direct physical injury -- itself triggers an immunity waiver under the Act.  See Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003.  Although a loss-of-consortium claim is a cause of action -- one that imparts a cognizable claim upon a plaintiff who otherwise would have no legal redress -- it imposes no standard of conduct upon actors other than the one imposed by the underlying tort that caused the direct injury.  See Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003, ¶ 13. Loss-of-consortium claims are similarly covered under the New Mexico Uninsured Motorist Act, N.M. Stat. Ann. § 66-5-301A.  See Arnold v. Farmers Ins. Co. of Am., 827 F. Supp. 2d 1289, 1300 (D.N.M. 2011)(Browning, J.)(citing State Farm Mut. Auto. Ins. Co. v. Luebbers, 119 P.3d 169, 174-77 (N.M. Ct. App. 2005)).

1979)(citing William L. Prosser, Law of Torts § 124, at 881-82 (4th ed. 1971)).  Over time, courts gradually expanded the scope of loss-of-consortium, first allowing wives to sue for loss of their husbands' consortium, see Rodriguez v. Bethlehem Steel Corp., 525 P.2d 669 (Cal. 1974),[9] and then opening the possibility for loss-of-consortium claims arising out of unmarried romantic cohabitant relationships, see Lozoya v. Sanchez, 2003-NMSC-009, parent-child relationships, see Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125, grandparent-grandchild relationships, see Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, and sibling relationships, see Wachocki, 2011-NMSC-039.

That is not to say, however, that all of these relationships are on equal footing with regard to loss-of-consortium claims.  The traditional spousal loss-of-consortium claim is still the most favored one,[10] and the more the nature of the relationship between the claimant and the injured parties resembles that of a traditional spousal relationship, the more likely courts are to find a loss-of-consortium claim cognizable.  In Lozoya v. Sanchez, 2003-NMSC-009, the Supreme Court of New Mexico adopted an eight-factor test to guide lower courts in deciding "whether an intimate familial relationship exists for loss of consortium purposes":

That standard must take into account [(i)] the duration of the relationship,

---

[9]No New Mexico case has ever held that a husband, but not a wife, can collect loss of consortium.  This developmental oddity most likely exists because New Mexico was the last state in the nation to recognize loss of consortium, which it did in 1994.  See Romero v. Byers, 1994-NMSC-031, 872 P.2d 840.  By the time of that case, contemporary legal sensibilities would have been against creating a new cause of action for men but not women.

[10]Spousal loss-of-consortium claims are equally favored when brought by a husband or wife, however, see, e.g., Colo. Rev. Stat. Ann. § 14-2-209 ("In all actions for a tort by a married woman, she shall have the same right to recover for loss of consortium of her husband as is afforded husbands in like actions."), and the Court concludes that any rule to the contrary would violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States of America, see U.S. Const. amend XIV, § 1, cl. 4.

> [(ii)] the degree of mutual dependence, [(iii)] the extent of common contributions to a life together, [(iv)] the extent and quality of shared experience, . . . [(v)] whether the plaintiff and the injured person were members of the same household, [(vi)] their emotional reliance on each other, [(vii)] the particulars of their day to day relationship, and [(viii)] the manner in which they related to each other in attending to life's mundane requirements.

2003-NMSC-009, ¶ 27.

These factors all go towards establishing the first element of a loss-of-consortium claim, which is that the directly injured individual and the claimant have a sufficiently close relationship.  There is also a second element that must be established to make out a viable loss-of-consortium claim: that the claimant was a foreseeable plaintiff.  See Solon v. WEK Drilling Co., Inc., 1992-NMSC-023 (incorporating Palsgraf's foreseeable-plaintiff rule into New Mexico loss-of-consortium claims).  The Court will briefly discuss the two elements.

1.     **A Sufficiently Close Relationship Between the Claimant and the Injured Person.**

Unlike many states which recognize loss-of-consortium claims only for certain specific relationships -- most commonly spouses, parents, and children, see, e.g., Ford Motor Co. v. Miles, 967 S.W.2d 377, 383-84 (Tex. 1998)(adopting a bright line limiting loss of consortium to spouses and parents and children, rejecting sibling and stepparent loss of consortium); Hutchinson v. Broadlawns Med. Ctr., 459 N.W.2d 273, 278 (Iowa 1990)(allowing spousal and parent-child loss-of-consortium claim, but categorically rejecting grandparent-grandchild claims); Villareal v. State Dep't of Transp., 774 P.2d 213, 218 (Ariz. 1989)(limiting loss of consortium to spouses, children, and parents); Mendillo v. Bd. of Educ., 717 A.2d 1177, 1188-89 (Conn. 1998)(limiting loss of consortium to spouses); Dearborn Fabricating & Eng'g Corp., Inc. v. Wickham, 551 N.E.2d 1135 (Ind. 1990)(categorically denying children's loss of consortium),

New Mexico allows any individual who satisfies the eight-factor test from <u>Lozoya v. Sanchez</u> to seek loss of consortium.

In its most recent loss-of-consortium case, <u>Wachocki</u>, the Supreme Court of New Mexico addressed the availability of sibling loss-of-consortium claims.   In that case, Bill Wachocki brought a loss-of-consortium claim related to his brother Jason Wachocki's death in a car accident.   <u>See</u> 2011-NMSC-039, ¶ 1.   A review of the facts of their relationship is instructive:

> Jason was 15 months older than Bill and as children they had shared a bedroom together.   At the time of Jason's death, they had been sharing an apartment for approximately eight months.   Jason and Bill split the rent, utilities, and grocery bills and shared household chores and cooking.   The brothers enjoyed a close relationship.   They spent their free time together, socializing, playing basketball, and going to the movies and the racetrack.   Bill considered his older brother his role model and best friend, and he relied on Jason for advice and emotional support.

2011-NMSC-039, ¶ 1.   The Court of Appeals of New Mexico had "denied the loss-of-consortium claim brought by Jason's brother, Bill," because the defendant, the Bernalillo County Sheriff's Department, could not have foreseen that injuring Jason would injure Bill's interest. 2011-NMSC-039, ¶ 3.   Moreover, the Court of Appeals of New Mexico "held that even if BCSD owed Jason a duty of care, no recovery was warranted because Bill had not shown he shared a sufficiently close relationship with Jason under the 'mutual dependence' factors we outlined in" <u>Lozoya v. Sanchez</u>, 2003-NMSC-009, ¶ 27.   <u>Wachocki</u>, 2011-NMSC-039, ¶ 3.

The Supreme Court of New Mexico in <u>Wachocki</u> explained that, under <u>Lozoya v. Sanchez</u>' "mutual dependence" factors, a court should "assess whether the claimant and the injured party shared a sufficiently close relationship."   <u>Wachocki</u>, 2011-NMSC-039, ¶ 4.   It continued:

> A loss-of-consortium claimant must demonstrate two elements in order to recover damages.   The first element is that the claimant and the injured party

shared a sufficiently close relationship.  In Lozoya[ v. Sanchez], we held that the following factors were relevant in determining whether the claimant and injured party shared such a close relationship:

> the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . . whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

2003-NMSC-009, ¶ 27 . . . .  The second element is a duty of care.  Lozoya, 2003-NMSC-009, ¶ 15 . . . .  The tortfeasor owes a duty of care to the claimant where it is foreseeable that the harm inflicted upon the injured party would damage the relationship between the injured party and the claimant.  Because we decide this appeal based on the lack of the first element -- a sufficiently close relationship -- we need not address foreseeability.

Wachocki, 2011-NMSC-039, ¶ 5 (selected citations and internal quotation marks omitted).

The Supreme Court of New Mexico first held that it is appropriate for courts to consider the Lozoya v. Sanchez factors in deciding sibling loss-of-consortium claims.  See Wachocki, 2011-NMSC-039, ¶ 6.  Wachocki argued "that sibling relationships are distinct from spousal-type relationships, and therefore some of the Lozoya factors, such as the extent and quality of shared experience and emotional reliance, are not applicable to an adult-sibling relationship." 2011-NMSC-039, ¶ 6.  Wachocki, therefore, asked the Supreme Court of New Mexico "to adopt a loss of consortium analysis that is specifically tailored to the unique nature of sibling relationships, considering such factors as whether siblings remain in close communication during adulthood, provide emotional support to one another, and share interests and activities."  2011-NMSC-039, ¶ 6.  The Bernalillo County Sherriff's Department argued that Wachocki's "proposed test would exalt the legal status of siblings over the fact-specific inquiry into mutual dependence, and therefore is inconsistent with our analysis in Lozoya."  2011-NMSC-039, ¶ 7.

The Supreme Court of New Mexico rejected Wachocki's proposed test and explained:

> We decline to inject factors specific to the sibling relationship into our loss of consortium analysis.  A relationship-specific test is not in accord with Lozoya, which clarified that legal status is not a "dispositive factor in determining whether loss of consortium benefits should be extended."  2003-NMSC-009, ¶ 20 n.2 . . . . Thus, it would contravene Lozoya to fashion a test that is directly dependent on the type of legal relationship involved.  Moreover, we are concerned that a relationship-specific test would detract from the important goals of clarity and stability in this area of the law.  A relationship-specific test would presumably spawn many iterations -- the factors would have to be tailored to siblings in this instance, then to many other types of relationships in cases to come.  With the proper analysis so reliant upon the nature of the relationship, we fear that lower courts would be left with little clear guidance when faced with a loss-of-consortium claim.
>
> Though we decline to inject sibling-specific factors into the analysis of whether the claimant and injured parties shared a sufficiently close relationship, we hold that the analysis should be streamlined to accommodate different types of relationships.  In Lozoya, we held that the degree of mutual dependence, as well as a host of other factors, such as duration of the relationship, emotional reliance, and sharing of a common residence, bear upon whether the claimant and injured party shared a sufficiently close relationship.  2003-NMSC-009, ¶ 27 . . . .  We acknowledge that these factors may be helpful in the context of some relationships, especially spousal-type relationships; however, we strive for a uniform analysis applicable to all relationships.
>
> With that goal in mind, we conclude that mutual dependence is the key element.   The unmarried cohabitants in Lozoya were certainly mutually dependent -- they jointly ran a household, made life decisions together and had made a long-term commitment to one another.  See id. ¶¶ 9-10, 29.  Similarly, in Fernandez v. Walgreen Hastings Co., a grandparent claiming loss of consortium shared a household with the granddaughter she lost and acted as the child's caretaker.  1998-NMSC-039, ¶¶ 4, 32, 126 N.M. 263, 968 P.2d 774. In both of these situations, the parties relied on the relationship and could not enjoy life in the same way once the relationship was severed.  Under such circumstances, the claimant and injured party are mutually dependent, and therefore the relationship was sufficiently close to permit recovery for loss of consortium.

Wachocki, 2011-NMSC-039, ¶¶ 8-10.

The Supreme Court of New Mexico then concluded that the facts did not satisfy the

mutual-dependence element:

> Before his death, Jason shared an apartment with Bill for approximately eight months.  The brothers "split bills and shared household chores, socialized together and relied on each other for friendship."  As the Court of Appeals noted, "recovery by a sibling may be proper," but here the "factual basis simply falls short."  We agree.  The brothers were roommates and shared a small amount of financial responsibilities, but we hold that their relationship did not exhibit the mutual dependence required for recovery.

2011-NMSC-039, ¶ 11 (citations omitted).  The Supreme Court of New Mexico acknowledged that many jurisdictions had rejected sibling loss-of-consortium claims and "emphasize[d] that our rejection of Bill's claim does not mean that a sibling cannot prevail in a loss-of-consortium claim. Where the facts demonstrate that two siblings shared a mutually dependent relationship, recovery for loss of consortium may be available."  2011-NMSC-039, ¶ 12.

### 2.    A Reasonably Foreseeable Claimant.

In Solon v. WEK Drilling Co., Inc. -- a case that the Supreme Court of New Mexico issued before it had ever recognized even a spousal loss-of-consortium claim, see Romero v. Byers, 1994-NMSC-031 -- the Supreme Court denied a parental loss-of-consortium claim on the ground that an injured employee's parents were unforeseeable plaintiffs under a Palsgraf analysis.

> [T]he factor -- if it is a factor -- or the prerequisite -- if it is that -- of foreseeability by WEK Drilling that its failure to maintain its drilling rig in a safe condition would cause harm to Ivan Ponce's parents is just too glaringly absent to convince us to recognize a cause of action in their favor for redress of that harm.  We may assume it is foreseeable that a 25-year-old employee of an independent contractor working on the drilling rig would have living parents, but is it foreseeable that he would reside with his parents, that there would be a close and loving relationship with them, and that they would be partially dependent on him for their economic support?  These facts do not come as a surprise, but we certainly cannot say that financially dependent parents were foreseeable to WEK Drilling as a matter of law.

> It is thoroughly settled in New Mexico, of course, that whether the defendant owes a duty to the plaintiff is a question of law.  We have no hesitancy in holding as a matter of law that the existence and interests of the Ponces and

- 26 -

their relationship with their son were unforeseeable to defendant WEK Drilling. While it is foreseeable that someone who is not provided a safe place to work will have living parents, the same can be said of the other relatives standing in an "intimate familial relationship" with a tort victim: his or her spouse, parent, child, grandparent, grandchild, brother, sister, and (in the case of a minor) others occupying a position in loco parentis.  The social policy of cutting off the liability that would otherwise extend to these family members seems sound, at least in a case in which they allege no more palpable injury than that claimed here.

1992-NMSC-023, ¶¶ 16-17.

It is unclear what has become of this element in the ensuing years since this decision. The element still exists, in some sense, as Solon v. WEK Drilling Co., Inc. has not been overturned, and its passages on foreseeability-based duty are quoted or conspicuously cited in almost all subsequent cases concerning loss of consortium.  See, e.g., Romero v. Byers, 1994-NMSC-031, ¶ 9;  Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, ¶ 30;  Lozoya v. Sanchez, 2003-NMSC-009, ¶ 15;  Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125, ¶¶ 12, 15;  Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003, ¶ 11; Wachocki, 2010-NMCA-021, ¶ 55.  See also Wachocki, 2010-NMCA-021, ¶ 54 ("[O]ur analysis of whether [the claimant] has met the burden of showing [requires]: (1) that it was foreseeable that he would be harmed as a result of the injury to Jason, and (2) that his and Jason's relationship was sufficiently close.").  That said, there appears to have been serious distortion in the meaning of the foreseeability standard as the loss-of-consortium jurisprudence developed in New Mexico; this development is unsurprising given that Solon v. WEK Drilling Co., Inc. was issued not merely in the claim's infancy but before its birth.  In Fernandez v. Walgreen Hastings Co., the Supreme Court allowed grandparents to seek loss of consortium for their infant grandchild.

Plaintiff argues that it can be foreseeable that negligently causing the death of a twenty-two month old child will cause emotional distress to a grandparent

who had a close familial relationship with the child.  We agree.  In New Mexico grandparents enjoy a special legal status in relation to their grandchildren.  See N.M. Stat. Ann. § 40-9-2(A) (authorizing court to "grant reasonable visitation privileges to a grandparent of a minor child").  In our state, it is not uncommon for several generations of a family to live in the same home, as in this case.  We hold that such foreseeability can exist where: (1) the victim was a minor; (2) the plaintiff was a familial care-taker, such as a parent or grandparent, who lived with and cared for the child for a significant period of time prior to the injury or death; (3) the child was seriously physically injured or killed; and (4) the plaintiff suffered emotional injury as a result of the loss of the child's companionship, society, comfort, aid, and protection.  In recognizing such a duty to the spouse of the injured party, we noted that "[o]ur recognition of spousal consortium will not disrupt settled expectations" because this claim "'imposes no new obligation of conduct on potential defendants.'"  The same is true here.

It is foreseeable that a negligent actor may cause harm or injury to a minor child's caretaker and provider of parental affection, as well as the child.  It is not unreasonable to compensate such a family care-giver for loss of consortium.  Further, merely because the plaintiff is a grandparent of the child should not foreclose an award of damages if he or she is able to prove the elements identified above.  On remand, Plaintiff shall be given the opportunity to prove, if she can, that she uniquely suffered a loss of her grandchild's consortium.

1998-NMSC-039, ¶¶ 31-32 (citations omitted).  When the Supreme Court of New Mexico

expanded spousal loss-of-consortium to unmarried cohabitants, it went through the following

duty analysis:

Defendants argue that allowing unmarried couples to recover for loss of consortium would create an impractical and unworkable cause of action.  This would only be true if this Court does not do its duty of providing sufficient guidance to lower courts when determining whether a claim should be allowed. We think that the criteria set forth in Dunphy [v. Gregor, 642 A.2d 372 (N.J. 1994)] help greatly in this regard.  Claimants must prove an "intimate familial relationship" with the victim in order to recover for loss of consortium.  "Persons engaged to be married and living together may foreseeably fall into that category of relationship.  '[G]iven the widespread reality and acceptance of unmarried cohabitation, a reasonable person would not find the plaintiff's emotional trauma to be "remote and unexpected."'"

Lozoya v. Sanchez, 2003-NMSC-009, ¶ 26 (second alteration in original)(citations omitted).

It thus appears that the foreseeability inquiry has fundamentally changed since Solon v. WEK Drilling Co., Inc. from a rigorous element to a fairly lax one.  In Solon v. WEK Drilling Co., Inc., the Supreme Court dismissed the loss-of-consortium claim on the ground that an employer could not possibly have foreseen that its actions on a work site would affect individuals -- an employee's parents -- whom the employer had likely never met and of whose existence it possibly had no knowledge.  The Supreme Court appeared to demand that the specific claimants -- in that case, individuals the employer had likely never met -- be at known or knowable risk of injury from the defendant's actions.  Of course, by their very nature, loss-of-consortium claims almost never satisfy this test, and, accordingly, not one loss-of-consortium claim had been allowed at the time of Solon v. WEK Drilling Co., Inc..  Today, the situation is reversed, and loss-of-consortium claims are liberally allowed in New Mexico.  The modern standard appears to ask not that the specific claimant be foreseeable, but that it be foreseeable that the injured party have someone in his life who might depend upon him or her for consortium, and that this someone have a relationship with the injured party that might foreseeably entail mutual dependence.  This standard sounds toothless, and it indeed appears to be: the Court can find not one post-Solon v. WEK Drilling Co., Inc. claim that has been struck down for lack of foreseeability.

Even when the Supreme of New Mexico denied sibling loss of consortium in Wachocki, it did so on the basis of relational closeness -- a lack of mutual dependence -- rather than foreseeability.  The Supreme Court relied on the analytical framework of Fernandez v. Walgreen Hastings Co. to analyze foreseeability:

> Our Supreme Court has outlined factors tending to prove or disprove the forseeability of harm to a relational interest in the context of minor children.  For example, in Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, the Court

concluded that a grandmother might be able to recover for loss of consortium where she had been the guardian, caretaker, and provider of parental affection to her deceased twenty-two-month-old granddaughter.  Under those facts, the Court stated that a loss of consortium claimant could be foreseeable given that:

> (1) the victim was a minor; (2) the plaintiff was a familial care-taker, such as a parent or grandparent, who lived with and cared for the child for a significant period of time prior to the injury or death; (3) the child was seriously physically injured or killed; and (4) the plaintiff suffered emotional injury as a result of the loss of the child's companionship, society, comfort, aid, and protection.

Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, ¶ 31.

Wachocki, 1998-NMSC-039, ¶ 51.  It is not at all obvious that the Supreme Court in Fernandez v. Walgreen Hastings Co. was laying out "factors" to be considered in evaluating the foreseeability element of loss-of-consortium claims.  The whole passage, quoted earlier in this opinion, makes it clear that the Supreme Court held that, if a case satisfies all of the four prongs, then it necessarily satisfies the foreseeability element of loss of consortium; it is not clear that the prongs/factors are generally relevant or that they should be applied in all loss-of-consortium cases. Also, despite the Supreme Court's casual labeling of the four "factors" as influencing only the foreseeability element -- not the relational element -- the Court would be hard-pressed to ever find the relational element unsatisfied when all four factors are present.  The overlap between relational inquiry and what the Supreme Court and Court of Appeals call the foreseeability inquiry is now so extensive that the Court can no longer meaningfully delineate the two.  Yet, the Fernandez v. Walgreen Hastings Co./Wachocki factors are the best available articulation of a foreseeability test for loss of consortium under New Mexico law.

The Court concludes that the relational element and the foreseeability element of the loss-of-consortium analysis have effectively merged into a unified duty analysis guided mostly by public policy and the facts of each case.  It will employ the Fernandez v. Walgreen Hastings

Co./Wachocki factors to the extent that they apply, but otherwise will presume that, if a sufficiently close relationship exists between the injured party and the claimant, it was reasonably foreseeable that consortium may be lost.

### ANALYSIS

The Court will deny the MTD as moot as to Counts IV and V, and grant the MTD as to Count VI.  The Plaintiffs clarify that they never intended to assert Counts IV or V against Correctional Healthcare, and, after the filing of the MTD, the parties voluntarily moved to dismiss those counts.  The Court will dismiss Count VI, as it is asserted against Correctional Healthcare, because Williams and Samayoa lack the relational closeness required to establish a loss-of-consortium claim.

**I.      THE COURT HAS ALREADY DISMISSED COUNTS IV AND V AS ASSERTED AGAINST CORRECTIONAL HEALTHCARE, AND THE COURT WILL THUS DENY THAT PORTION OF THE MTD AS MOOT.**

After completion of briefing on the MTD, the parties filed an order, which the Court signed, providing as follows:

> THIS MATTER comes before the Court upon the voluntary dismissal of Plaintiffs' claims against Defendant Board of Regents of the University of New Mexico ("UNMBOR") and Correctional Healthcare Companies, Inc. (CHC) for intentional infliction of emotional distress (Count IV) and negligent infliction of emotional distress (Count V) set forth in Plaintiff's Second Amended Complaint. All parties have stipulated to this dismissal and pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), Plaintiffs voluntarily dismiss with prejudice **Counts IV and V** of their Second Amended Complaint against Defendant UNMBOR and CHC with prejudice in the above-styled matter.

> It is therefore ordered that the claims against Defendant UNMBOR and CHC set forth in Counts IV and V of Plaintiffs' Second Amended Complaint are hereby dismissed with prejudice in the above-styled matter.

Stipulated Order Dismissing Counts IV and V Against Defendant Board of Regents of the University of New Mexico and Correctional Healthcare Companies, Inc. at 1-2 (emphasis in original).

Because Correctional Healthcare has already obtained the relief it seeks by way of that portion of the MTD, those arguments are no longer justiciable by the Court.  The Court will, therefore, deny that portion of the MTD as moot.  The Court intimates no view on the merits of Correctional Healthcare's arguments on Counts IV and V in the MTD.

## II.   THE COURT WILL DISMISS COUNT VI AS ASSERTED AGAINST CORRECTIONAL HEALTHCARE, BECAUSE WILLIAMS AND SAMAYOA LACK THE MUTUAL DEPENDENCE REQUIRED FOR A LOSS-OF-CONSORTIUM CLAIM.

The Court concludes that -- based on the allegations in the SAC -- the relationship between Williams and Samayoa lacks the mutual dependence required for Williams to seek loss of consortium.  The New Mexico courts have never recognized a loss-of-consortium claim arising from a relationship between a parent and an adult child, and there is even some antiquated precedent suggesting such claims are barred.  See infra note 12, at 2.  Even if parent-adult child loss-of-consortium claims are cognizable, the Court concludes that they must contain a level of mutual dependence that is well out of the ordinary for such relationships.  The SAC contains barely any allegations describing the nature of the relationship that Williams and Samayoa shared -- let alone facts sufficient to demonstrate the mutual dependence required -- leaving the Court to wonder whether the Plaintiffs understood their pleading obligations in stating this cause of action.  The Court will, therefore, dismiss Count VI as it is asserted against Correctional Heatlhcare, but it will do so without prejudice so that the Plaintiffs can reassert their claim if the uncover and allege facts establishing mutual dependence.

At the outset, the Court will acknowledge that it has had some difficulty drawing cogent standards from New Mexico's loss-of-consortium case law.   The development of loss-of-consortium law since 1992 has not been one of progressive refinement but one of radical acceleration followed by gradual moderation: from being the last state in the United States to recognize loss of consortium in any circumstances in 1994; to being the first to expand it outside of spousal and parent-child contexts in 1998; to being the first in the nation to allow unmarried romantic cohabitants to seek loss of consortium, and establishing a list of factors for doing so, in 2003; to setting up a standard for sibling loss-of-consortium claims which seems to the Court to be strict in theory but fatal in fact in 2011 -- all while never overruling any previous cases and continuing to honor a 1992 foreseeable-plaintiff test which no longer seems to do any real work. In twenty years, New Mexico has gone from zero to sixty on loss of consortium and then slowed back down again.   These changes may have moved the law in a normatively desirable direction, but they have left courts like this one with little firm guidance and very little trust in relying on cases more than a few years old.   A linchpin of the Plaintiffs' argument in this case is that Solon v. WEK Drilling Co., Inc. is ancient history and, despite never being overruled, should be given short shrift by the Court in light of subsequent movements in New Mexico loss-of-consortium jurisprudence.   The Court does not ordinarily grant such requests -- particularly when the case in question was issued in 1992, rather than 1932.   in this case, however, the Court agrees that it must take special care to not lose sight of the forest of case law for the trees of any particular case, especially where that case may be more a reflection of its time -- the initial distrust of loss of consortium or the subsequent, exuberant expansion of the claim -- than it is an even-handed encapsulation of extant law.   The Court also concludes that, more than in most situations, it must weigh recent cases more heavily than older ones.   Last, the Court is reticent to use non-New

Mexico specific case law or treatises to resolve ambiguities in the state's loss-of-consortium law; despite being late to the game, the New Mexico courts have displayed no compunction about blazing their own trail without regard to defining the scope of the claim.  See, e.g., Wachocki, 2011-NMSC-039, ¶ 12 ("We are mindful of the limited nature of loss-of-consortium claims in other jurisdictions. . . .  Though we recognize that other jurisdictions draw the line at particular relationships, we emphasize that our rejection of Bill's claim does not mean that a sibling cannot prevail in a loss-of-consortium claim.").

The Court concludes that Wachocki's refinement of the Lozoya v. Sanchez factors constitute the best analytical framework for assessing whether a claimant satisfies the relational closeness element.  The Lozoya v. Sanchez test for relational closeness is as follows:

> [(i)] the duration of the relationship, [(ii)] the degree of mutual dependence, [(iii)] the extent of common contributions to a life together, [(iv)] the extent and quality of shared experience, . . . [(v)] whether the plaintiff and the injured person were members of the same household, [(vi)] their emotional reliance on each other, [(vii)] the particulars of their day to day relationship, and [(viii)] the manner in which they related to each other in attending to life's mundane requirements.

2003-NMSC-009, ¶ 27.  This eight-factor test has never been overruled,[11] and the New Mexico courts continue to employ it consistently, up to and including in Wachocki, which adds the following clarifications:

> [T]he Lozoya "mutual dependence" factors[ were] developed for spousal-type relationships . . . .   [S]ibling relationships are distinct from spousal-type relationships, and therefore some of the Lozoya factors, such as the extent and quality of shared experience and emotional reliance, are not applicable to an adult-sibling relationship.  Thus, [the Plaintiff] urges this Court to adopt a loss of consortium analysis that is specifically tailored to the unique nature of sibling relationships, considering such factors as whether siblings remain in close

---

[11]Lozoya v. Sanchez was abrogated on other grounds -- unrelated to loss of consortium -- in 2008.  See Health v. La Mariana Apts., 2008-NMSC-017.

communication during adulthood, provide emotional support to one another, and share interests and activities.

[L]oss-of-consortium claims are intended to compensate for "damage to a relational interest, not a legal interest." Therefore, we decline[] to utilize "legal status as a proxy for a significant enough relational interest," and held that cohabitants, even though not legally married, may be entitled to recover.

We decline to inject factors specific to the sibling relationship into our loss of consortium analysis. A relationship-specific test is not in accord with Lozoya, which clarified that legal status is not a "dispositive factor in determining whether loss of consortium benefits should be extended." Thus, it would contravene Lozoya to fashion a test that is directly dependent on the type of legal relationship involved. Moreover, we are concerned that a relationship-specific test would detract from the important goals of clarity and stability in this area of the law. A relationship-specific test would presumably spawn many iterations -- the factors would have to be tailored to siblings in this instance, then to many other types of relationships in cases to come. With the proper analysis so reliant upon the nature of the relationship, we fear that lower courts would be left with little clear guidance when faced with a loss-of-consortium claim.

Though we decline to inject sibling-specific factors into the analysis of whether the claimant and injured parties shared a sufficiently close relationship, we hold that the analysis should be streamlined to accommodate different types of relationships. In Lozoya, we held that the degree of mutual dependence, as well as a host of other factors, such as duration of the relationship, emotional reliance, and sharing of a common residence, bear upon whether the claimant and injured party shared a sufficiently close relationship. We acknowledge that these factors may be helpful in the context of some relationships, especially spousal-type relationships; however, we strive for a uniform analysis applicable to all relationships.

With that goal in mind, we conclude that mutual dependence is the key element. The unmarried cohabitants in Lozoya were certainly mutually dependent -- they jointly ran a household, made life decisions together and had made a long-term commitment to one another. Similarly, in Fernandez v. Walgreen Hastings Co., a grandparent claiming loss of consortium shared a household with the granddaughter she lost and acted as the child's caretaker. In both of these situations, the parties relied on the relationship and could not enjoy life in the same way once the relationship was severed. Under such circumstances, the claimant and injured party are mutually dependent, and therefore the relationship was sufficiently close to permit recovery for loss of consortium.

Wachocki, 2011-NMSC-039, ¶¶ 6-10.

The Court will thus conduct an inquiry into the mutual dependence between Williams and Samayoa, using a holistic inquiry that may be informed by the Lozoya v. Sanchez factors, the Fernandez v. Walgreens Hastings Co., Inc. factors, and any other factors the Court deems relevant.  As the New Mexico courts have made clear time and again, the relational closeness inquiry -- which goes to determine of duty of care, a question of law -- is one for the Court, and although the Court must of course accept all facts alleged in the SAC as true, it need not defer close cases to the jury.  See, e.g., Lozoya v. Sanchez, 2003-NMSC-009, ¶ 20 (stating that the eight-factor test, not the use of legal proxies, must be used "to determine to whom a duty is owed"); Solon v. WEK Drilling Co., Inc., 1992-NMSC-023, ¶ 17 ("It is thoroughly settled in New Mexico, of course, that whether the defendant owes a duty to the plaintiff is a question of law.").

The SAC alleges the following facts relevant to the mutual dependence inquiry: (i) that Samayoa was Williams' son, see SAC ¶ 14, at 3; (ii) that Samayoa was 25 years old, see SAC ¶ 13, at 3; (iii) that Samayoa had a "very significant psychiatric history include a traumatic brain injury," diagnoses of "chronic schizophrenia, paranoid ideation, intermittent explosive disorder, auditory hallucinations, post traumatic stress disorder, [and] borderline intellectual disorder," SAC ¶¶ 13, 15, at 3; see id. ¶ 26, at 5; id. ¶ 27, at 6; (iv) that at least at one point after "his release from the hospital in August 2010," Samayoa "could hold meaningful conversations with" William, SAC ¶ 16, at 4; and (v) that since the alleged torts, Samayoa "has not regained enough mental stability to hold any degree of meaningful conversations with" Williams, SAC ¶ 28, at 6. The sole loss-of-consortium injury Williams claims is "loss society, [sic] companionship and the ability to rationally communicate with her son."  SAC ¶ 61, at 11.  The ability to have "meaningful conversations" and provide "companionship" is present in the vast majority of

parent-adult child relationships, and, yet, New Mexico courts have never recognized a loss-of-consortium claim stemming from a relationship between a parent and an adult child.   See Cheromiah v. United States, 55 F. Supp. 2d at 1309 ("It is true that although New Mexico recognizes loss of consortium claims for the death of a minor child, State law does not permit such claims for the parents of an adult child."  (citing Solon v. WEK Drilling Co., Inc., 829 P.2d 645, 650)).[12]

_____

[12]The Honorable Martha A. Vazquez, United States District Judge for the District of New Mexico, came to the conclusion that New Mexico law categorically forbids loss-of-consortium claims arising from a relationship between a parent and an adult child, undoubtedly relying on the following passage written by the Supreme Court of New Mexico:

> We may assume it is foreseeable that a 25-year-old employee of an independent contractor working on the drilling rig would have living parents, but is it foreseeable that he would reside with his parents, that there would be a close and loving relationship with them, and that they would be partially dependent on him for their economic support?  These facts do not come as a surprise, but we certainly cannot say that financially dependent parents were foreseeable to WEK Drilling as a matter of law.

Solon v. WEK Drilling Co., Inc., 1992-NMSC-023, ¶ 16.  While it may have seemed clear to Judge Vazquez in 1999 that Solon v. WEK Drilling Co., Inc. barred parent-adult child loss-of-consortium claims, it is far from clear to the Court now.  Solon v. WEK Drilling Co., Inc. never directly states such a rule -- the above-quoted passage is as close as it gets -- and a special concurrence by the Honorable Richard E. Ransom, Chief Justice of the Supreme Court of New Mexico, even takes the opposite position.  See 1992-NMSC-023, ¶ 24 ("[I]t is foreseeable that parents of an adult child would suffer loss of financial support and consortium from his wrongful death.").  Moreover, subsequent cases have done everything they can to run away from bright-line rules in favor of holistic standards, and while the Court concludes that it is very telling that no New Mexico court has ever approved of a parent-adult child loss-of-consortium claim, the Court thinks it unlikely that the Supreme Court of New Mexico would adopt a per se bar to such actions.  The Supreme Court's language in Wachocki that it "strive[s] for a uniform analysis applicable to all relationships" strongly suggests to the Court that parent-adult child relationships should be analyzed for mutual dependence like any other relationship.  2011-NMSC-039, ¶ 9.  The Court, however, need not blind itself to the obvious implications of the fact that no court has recognized a loss-of-consortium claim for such a relationship: if a parent-adult child relationship is to satisfy the demands of loss-of-consortium analysis, the relationship must involve a degree of mutual dependence well out of the ordinary for such relationships.

Nothing in the SAC suggests a relationship of mutual dependence between Williams and Samayoa.  The SAC does not allege that Williams and Samayoa live together -- to the contrary, allegations in the SAC imply that Samayoa has spent significant time institutionalized -- nor that she provided him with medical or financial support, facts which the Plaintiffs have asserted in their briefing.  Even if those facts had been alleged in the SAC, however, they would not give rise to any inference of <u>mutual</u> dependence; it would suggest, instead, that Samayoa was unilaterally dependent upon Williams.  Moreover, no facts are alleged to suggest that the injury to Samayoa changed the relationship's fundamental nature, that Williams "could not enjoy life in the same way once the relationship was severed," or that the relationship has been "severed" at all.  <u>Wachocki</u>, 2011-NMSC-039, ¶ 10.

Apart from the facts alleged in the SAC, there may well exist a relationship of mutual dependence between Samayoa and Williams wherein Samayoa provides Williams with intangible emotional, physical, or psychological support in exchange for the tangible financial and medical support he receives from her, but the Plaintiffs allege no such relationship.  While loss of consortium resembles a category of damages -- like economic, punitive, or pain-and-suffering -- it is in fact a separate cause of action brought by a plaintiff -- here, Williams -- who would otherwise have no direct participation in the case.  <u>See</u> <u>Brenneman v. Bd. of Regents of Univ. of N.M.</u>, 2004-NMCA-003, ¶ 9 (stating that loss of consortium is "derivative claim," which is "a [claim] arising from an injury to another person" (alteration in original)(quoting <u>Black's Law Dictionary</u> 455 (7th ed. 1993))(internal quotation marks omitted)).[13]  As a cause of action, the

---

[13]The Court will discuss <u>Brenneman v. Board of Regents of University of New Mexico</u> further, because, although the Plaintiffs never mentioned the case in their briefing on the MTD, they referenced it several times at the hearing.  <u>See</u> Tr. at 19:9-20:8 (Barela); <u>id.</u> at 21:22-24:5 (Barela, Court); <u>id.</u> at 26:21-27:4; <u>id.</u> at 28:12-19 (Barela); <u>id.</u> at 29:4-8 (Barela); <u>id.</u> at 29:17-19

(Barela); id. at 34:18-23 (Barela); id. 35:1-11 (Barela); id. at 37:17-18 (Barela); id. at 43:10-11 (Barela); id. at 44:3-9 (Barela).  Most of these references are in passing, see, e.g., Tr. at 29:8 (Barela)("But I think Brenneman is key, and Wachocki."), but it is nonetheless appropriate for the Court to address the case.

Brenneman v. Board of Regents of University of New Mexico has little, if any, bearing on this case.  That case holds that the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -30 ("NMTCA"), waives the State's sovereign immunity against loss-of-consortium claims even though the statute's text does not explicitly mention "loss of consortium."  See Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003 ¶¶ 1, 6-9. A more complete encapsulation of the holding is that, when a government actor commits one of the NMTCA's enumerated torts and is therefore liable "for damages resulting from bodily injury[ or] wrongful death . . . caused by" that tort, the government actor is also on the hook for any loss of consortium that those close to the victim suffer.  N.M. Stat. Ann. § 41-4-9.  See Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003 ¶¶ 1, 6-9.  It is somewhat unusual for a court to interpret a statutory immunity waiver to apply to a cause of action that is not enumerated in the statute, and the Court of Appeals bases its conclusion on two strands of reasoning.  The Court of Appeals' primary basis for expanding the waiver is textual: that loss of consortium is a "damage[] that results from bodily injury."  See 2004-NMCA-003, ¶ 9 ("[L]oss of consortium [i]s a derivative claim.  A 'derivative action' is defined as 'a [claim] arising from an injury to another person.'  The plain meanings of 'resulting from' and 'arising from' are identical."  (third alteration in original)(citations omitted)).  To the extent that the Plaintiffs use this basis to argue that loss of consortium is foreseeable even in non-death cases, the Court agrees.  See Tr. at 22:7-8 (Barela)("[T]his nonfatal stuff is a complete red herring.  [Loss of consortium i]s a derivative claim from bodily injury.").  That being said, the extent of the direct physical injury may still be important in determining whether the consortium relationship was "severed" or fundamentally changed as a result of the physical injury-causing event.  Wachocki, 2011-NMSC-039, ¶ 10.

The Court of Appeals' second basis, however, is purposive -- an articulable rationale that puts into words the gut intuition that, when a statute effectuates a blanket waiver of immunity for all negligence claims, it probably does not intend to categorically deny plaintiffs loss-of-consortium damages that arise out of negligence, just because loss of consortium is technically a separate cause of action.  It is this basis that the Plaintiffs confuse as being supportive of their case.  The Court will reproduce this entire portion of the opinion:

> Even if the phrase "resulting from bodily injury" leaves some ambiguity regarding its inclusion of loss of consortium damages, we reach the same result through construction and interpretation of the Act as a whole.  The section of the Act pertaining to legislative findings and the Act's purpose states, "Liability for acts or omissions under the Tort Claims Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty."  Section 41–4–2(B).  "The entire basis of the Act is premised on traditional concepts of negligence . . . ."  Methola v. Eddy Cnty., 1980-NMSC-145, ¶ 19, 622 P.2d 234, 237.

The traditional tort concept at issue here is the foreseeability of the plaintiffs seeking to recover loss of consortium damages, specifically, Ms. Brenneman's spouse and minor children.  In analyzing the foreseeability of Plaintiffs under the Act, we use the test from Solon v. WEK Drilling Co.

In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person.

. . . .

Duty and foreseeability have been closely integrated concepts in tort law since the court in [Palsgraf] stated the issue of foreseeability in terms of duty.  If it is found that a plaintiff, and injury to that plaintiff, were foreseeable, then a duty is owed to that plaintiff by the defendant.

The question of whether Plaintiffs claiming loss of consortium are foreseeable under Solon has already been answered affirmatively by the body of cases recognizing and expanding the loss of consortium claim in New Mexico. The Solon test was central in determining that spousal loss of consortium plaintiffs are foreseeable.  Subsequently, the Court used the Solon analysis to determine that grandparental caretakers of minor children and unmarried cohabitants seeking loss of consortium were also foreseeable.

Defendant correctly summarizes our Tort Claims Act precedents to say that courts are hesitant to expand the obligations of public employees and seek a "specific waiver of immunity" before allowing suit.  However, the specific waiver of immunity in this case already exists pursuant to Sections 41-4-9 and -10, making the hospital liable for any negligence by its employees who had a duty to employ reasonable care in providing health care services and operating the facility.  Allowing Plaintiffs to recover loss of consortium damages will not impose any new duty on Defendant because "this cause of action imposes no new obligation of conduct."

. . . .

In enacting the Tort Claims Act, the Legislature intended to balance competing considerations:

The legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity.  On the other hand, the legislature recognizes that while a private party may readily be held liable for

> his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.
>
> N.M. Stat. Ann. § 41-4-2(A).  The Legislature achieved this balance by waiving sovereign immunity with respect to specific people and places which, in the performance of certain governmental functions, give rise to traditional duties to the public.  Once a duty is established, loss of consortium damages flow from the principles of tort liability.  As loss of consortium is a damage resulting from bodily injury and our courts have repeatedly held that loss of consortium plaintiffs are foreseeable, we believe that loss of consortium is exactly the type of damage "based upon the traditional tort concepts of duty" that the Legislature intended to include under the applicable waivers of sovereign immunity in the Act.

Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003, ¶¶ 10-13, 19 (first and second omissions in original)(citations omitted).  See Tr. at 35:1-11 (Barela)(quoting an annotation to Brenneman v. Bd. of Regents of Univ. of N.M. that summarizes the above passage).

 The Court notes three features of Brenneman v. Board of Regents of Univ. of N.M. that would each on its own render that case inapposite to this case.  First, that case involves a loss-of-consortium claim based on a spousal relationship and a parent-minor child relationship, and not the parent-adult child relationship at issue here.  See 2004-NMCA-003, ¶ 11 ("The . . . concept at issue here is the foreseeability of the plaintiffs seeking to recover loss of consortium damages, specifically, Ms. Brenneman's spouse and minor children.").  Second, that case deals with foreseeability, but never even mentions the relational closeness element of a loss-of-consortium claim, which is the element upon which the Court grants the MTD.  The Court has already acknowledged that it is skeptical of the vitality of foreseeability element and has all but discounted Solon v. WEK Drilling Co., Inc. -- a case that Correctional Healthcare hammered just as hard at the hearing as the Plaintiffs did Brenneman v. Board of Regents of University of New Mexico.  Third, although the Court of Appeals talks about foreseeability, it is not talking about the foreseeability element of a prima facie loss-of-consortium claim; the case does not address substantive loss-of-consortium law at all.  It is concluding only that the NMTCA intends to impose upon government actors -- in that case, medical professionals -- the same duty to all foreseeable plaintiffs to which they would be subject under "traditional concepts of negligence," upon which "[t]he entire basis of the Act is premised."  Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003, ¶ 10 (quoting Methola v. Eddy Cnty., 1980-NMSC-145, ¶ 19)(internal quotation marks omitted).

 For these reasons, the Court concludes that Brenneman v. Board of Regents of University of New Mexico has minimal relevance to this motion.  The Court can understand why the Plaintiffs rely upon it so heavily: Correctional Healthcare came on strong with its foreseeability argument -- bandying about what it felt was a sure-winner of a case in Solon v. WEK Drilling Co., Inc. -- and the Plaintiffs concluded that they needed a strong counter to the argument.  The Court, however, has largely been convinced by other means that foreseeability does not foil the Plaintiffs' case, and the result is that Brenneman v. Board of Regents of University of New

Mexico has little impact on the Court's analysis.  The holding in Brenneman v. Board of Regents of University of New Mexico is a narrow one: that loss of consortium can be recovered under the NMTCA.  It does not expand substantive loss-of-consortium law, nor does it state that all alleged loss-of-consortium claimants are automatically foreseeable plaintiffs.

Even if Brenneman v. Board of Regents of University of New Mexico were the smoking gun that the Plaintiffs evidently believe it to be, that it comes from the Court of Appeals of New Mexico, and not from the Supreme Court of New Mexico, lessens the weight the Court could properly accord it.  In performing its duty under Erie Railrad Co. v. Tompkins, 304 U.S. 64 (1938), the Court must find state law as it would be declared by the state's highest court.  See 17 James Wm. Moore et al., Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967))("[F]ederal court[s] must attempt to predict how the state's highest court would rule if confronted with the issue.").  In fact, if the Tenth Circuit has issued an opinion interpreting state law, district courts may not even consider the impact of subsequent Court of Appeals of New Mexico cases, but must limit their consideration of "intervening decision[s]" to Supreme Court of New Mexico cases only.

In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of stare decisis.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court."  See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed.1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate

- 42 -

Plaintiffs bear the burden of alleging facts that plausibly establish each element if they hope to

avoid dismissal under rule 12(b)(6).  Because the Plaintiffs have not properly pled their claim,

but additional facts may exist supporting loss of consortium, the Court will dismiss Count VI

without prejudice, so that the Plaintiffs can reassert the claim at a later date if it uncovers and

alleges new facts supporting mutual dependence.  The Court warns the Plaintiffs, however, that

---

courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

> Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Colorado Court of Appeals holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010) (Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo.Ct.App.1996) ], so it is not an 'intervening decision of the state's highest court.' " (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *44 n.30 (D.N.M. May 16, 2014)(Browning, J.).  The Tenth Circuit has not issued an opinion interpreting New Mexico loss-of-consortium law, but the Supreme Court of New Mexico has.  Thus, even if Brenneman v. Board of Regents of University of New Mexico represented a drastic departure from the Supreme Court's loss-of-consortium cases -- and, again, the Court concludes that it does not -- the Court would still decline to rely on it.

the holding in <u>Wachocki</u>, and the fact that no New Mexico court has recognized a loss-of-consortium claim for an parent-adult child relationship, make clear that any such relationship must exhibit a level of mutual dependence which rises far above the norm.  The Court is extremely skeptical that this case, even with additional facts, will ever meet that bar.

**IT IS ORDERED** that Correctional Healthcare Companies Inc.'s Partial Motion to Dismiss Plaintiff's Second Amended Complaint for Damages and Medical Negligence, filed January 30, 2014 (Doc. 63)("MTD"), is granted in part and denied in part.  The Court dismisses without prejudice Count VI to the extent that it is alleged against Defendant Correctional Healthcare Companies, Inc. ("Correctional Healthcare"); because the Court has already dismissed Counts IV and V as asserted against Correctional Healthcare, it will deny that potion of the MTD as moot.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Elias Barela
Los Lunas, New Mexico

> *Attorney for the Plaintiffs*

Henry F. Narvaez
Bryan C. Garcia
Narvaez Law Firm, P.A.
Albuquerque, New Mexico

> *Attorneys for Defendants Board of Regents of the University of New Mexico, University of New Mexico Health Sciences Center, University of New Mexico School of Medicine, University of New Mexico Hospital Behavioral Health Programs, and the University of New Mexico Psychiatric Center*

Carlos M. Quinones
Quinones Law Firm
Santa Fe, New Mexico

*Attorney for former-Defendant Bernalillo County Metropolitan Detention Center*

Alfred A. Park
Lawrence M. Marcus
Park & Associates, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Correctional Healthcare Companies, Inc.*